NOT FOR PUBLICATION

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>DERRICK M. JONES,<br><br>Defendant. | Criminal Action No. 09-491 (RK)<br><br>**MEMORANDUM ORDER** |

**KIRSCH, District Judge**

**THIS MATTER** comes before the Court upon *pro se* Defendant Derrick M. Jones' ("Defendant" or "Jones") motion for compassionate early release pursuant to 18 U.S.C. § 3582(c)(1)(A). (ECF No. 9.) The Government opposes the Motion. (ECF No. 10.) Defendant replied on July 2, 2025. (ECF No. 11.) The Court has carefully considered the parties' submissions and, for the reasons below, the Motion for Compassionate Release is **DENIED.**

## I.   BACKGROUND

Defendant's present period of incarceration arises out of a drug distribution territory dispute gone wrong that culminated in his killing a fourteen-year-old boy with an illegally purchased firearm. (*See* ECF No. 1-1.) According to the Superseding Indictment in this matter, to which Defendant pled guilty on all counts (*see* ECF Nos. 3–4), the circumstances surrounding the subject criminal activity began in early 2005, when Defendant formed a criminal drug-dealing enterprise that was sometimes referred to as "OGM" or "Organization to Get Money." (ECF No. 1-1 at 1.) OGM, led by Defendant, distributed illegal drugs, including crack cocaine, at a residential complex called Arborwood Condominiums, located in Lindenwold, New Jersey. (*Id.*) In the summer of 2005, "a rivalry arose over the control of the local drug market between Jones and a

female drug dealer who lived in Arborwood Condominiums." (*Id.*) In July of that year, Defendant and his girlfriend were assaulted by masked men who Jones believed were sent by his drug rival. (*Id.*) Defendant and his girlfriend subsequently left New Jersey and went to Radford, Virginia, where Defendant planned to buy a firearm and ammunition and then travel back to New Jersey to "shoot up" his drug rival. (*Id.* at 2.) Defendant requested his sister to purchase a .45 caliber semiautomatic pistol and ammunition for him because he had been previously convicted of a felony, which rendered him unable to purchase a gun himself. (*Id.*)

After travelling back to New Jersey in August 2005, Defendant and his girlfriend slept in a motel near Arborwood Condominiums, ready to seek revenge on the rival drug dealer. (*Id.*) Early in the morning on August 29, 2005, Defendant fired seven rounds into the condo unit of his rival; one of the bullets hit and killed B.R., a fourteen-year-old boy who was asleep in his bed. (*Id.*)

In the Western District of Virginia, Defendant was charged with five counts based on his illegal purchase of the firearm in Virginia and his killing of B.R.: (1) being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1) and § 924(a)(2); (2) possessing a firearm with removed or altered serial numbers, in violation of 18 U.S.C. § 922(k) and § 924(a)(1)(B); (3) knowingly making a false or fictious oral or written statement intended or likely to deceive a firearm dealer, in violation of 18 U.S.C. § 922(a)(6) and § 2; (4) knowingly making a false statement or representation with respect to information required to procure a firearm, in violation of 18 U.S.C. § 924(a)(1)(A) and § 2; and (5) travel in interstate commerce with the intent to commit a crime of violence to further any unlawful activity, resulting in death, in violation of 18 U.S.C. § 1952(a)(2) and § 1952(a)(3)(B). (*See* ECF Nos. 1-1, 4.)

In June 2009, the parties agreed to transfer the case to the United States District Court for the District of New Jersey, pursuant to Rule 20 of the Federal Rules of Criminal Procedure. (ECF

No. 1.) On July 13, 2009, Defendant pled guilty to all five counts in the Superseding Indictment. (ECF Nos. 3–4.) On October 22, 2009, the Honorable Joel A. Pisano, U.S.D.J. (ret.) sentenced Defendant to a term of 300 months' imprisonment, followed by a supervised release term of five years. (ECF No. 7 at 1, 3–4.)[1] Defendant's 25-year prison sentence is set to expire on June 6, 2027. *See* Reg. No. 41332-050, *Inmate Locator,* Bureau of Prisons, https://www.bop.gov/inmateloc/ (last visited Sept. 2, 2025.)

On April 14, 2025, Defendant moved for a sentence reduction pursuant to 18 U.S.C. § 3582(c)(1)(A), also known as the First Step Act. (ECF No. 9.)[2] Defendant, who is now 45 years old, argues that the Court should grant his early release because his parents are "elderly and ill" and he is the only person available to care for them. (*Id.* at 1.) Specifically, Defendant asserts that his father suffers from diabetes and an amputated foot, and his mother has cancer. (*Id.* at 5.) The Government opposed the Motion (ECF No. 10)[3], and Defendant replied (ECF No. 11.) The Motion is now ripe for disposition.

## II. <u>LEGAL STANDARD</u>

Once a federally imposed sentence commences, a district court has limited authority to modify that sentence. *Dillon v. United States*, 560 U.S. 817, 824–25 (2010). However, 18 U.S.C. § 3582 allows a criminal defendant to request a reduction in sentence if certain parameters are met. *See* 18 U.S.C. § 3582(c)(1)(A). Before a defendant can bring a motion for reduced sentence on his

---

[1] Specifically, Defendant was sentenced to 300 months of imprisonment for each of Count One and Count Five, 120 months of imprisonment on Counts One and Three, and 60 months of imprisonment on Counts Two and Four. (ECF No. 4 at 3.) Each sentence was ordered to run concurrently. (*Id.*)

[2] On April 14, 2025, this matter was assigned to the Undersigned. (ECF No. 8.)

[3] Pursuant to the Crime Victims' Rights Act, 18 U.S.C. § 3771, the Government notified the victim's family of Defendant's application for release. (*See* ECF No. 10 at 10.) Accompanying its submission in opposition to Defendant's Motion, the Government provided a memorandum of its interview with the victim's mother and grandmother. (ECF No. 10-2.) Both unambiguously expressed a desire for Defendant to serve the entirety of his sentence without early release. (*See id.*)

3

own behalf directly with the district court, a defendant "must at least ask the Bureau of Prisons (BOP) to do so on [his] behalf and give BOP thirty days to respond.". *United States v. Raia*, 954 F.3d 594, 595 (3d Cir. 2020) (discussing the exhaustion requirement).

Once Section 3582(c)(1)(A)'s exhaustion requirements are met, a court may reduce an inmate's sentence if it finds that there are "extraordinary and compelling reasons" that warrant a reduction; and it considers the sentencing factors set forth in 18 U.S.C. § 3553(a), as applicable. *United States v. Pawlowski*, 967 F.3d 327, 329–30 (3d Cir. 2020).

### III. DISCUSSION

The Court engages in a three-step inquiry to determine whether to grant Defendant's Motion for Compassionate Release: *first*, whether Defendant has exhausted his administrative remedies, *see Raia*, 954 F.3d at 596–97; *second*, whether Defendant has met his burden to demonstrate an extraordinary and compelling reason justifying a sentence reduction, *see United States v. Kramer*, No. 23-1246, 2024 WL 313389, at *1 (3d Cir. Jan 26, 2024), and *third*, whether early release is warranted pursuant to the factors enumerated under 18 U.S.C. § 3553(a), *see Pawolwski*, 967 F.3d at 329. *See* 18 U.S.C. § 3582(c)(1)(A).

Here, in agreement with both parties, the Court is satisfied that Defendant exhausted his administrative remedies. Defendant submitted a request for compassionate release to the warden of the Federal Correctional Institution in Edgefield, South Carolina where he is incarcerated on January 24, 2025, and as of April 14, 2025—more than 30 days later—Defendant had received no response. (ECF No. 9 at 4; ECF No. 10 at 4 n.2 (Government's representation that "[t]he Court should find that Jones has exhausted his claim with the BOP.")). Accordingly, the Court proceeds to analyze the final two steps.

## A. EXTRAORDINARY AND COMPELLING REASONS

Defendant contends that he should be granted early release from incarceration because his parents "are elderly and in poor health, with no stable caregivers to provide the level of care they booth need." (ECF No. 9 at 6.) Specifically, Defendant asserts that his father's foot was amputated because of his diabetes and his mother has cancer and is unable to care for her father and herself. (*Id.*) For two reasons, Defendant has not met his burden to demonstrate an extraordinary and compelling justification: *first*, the medical records provided—most of which are unreadable—do not establish his parents' dire medical condition. *Second*, Defendant has not established that he is his parents' "only available caregiver." *See* U.S.S.G. § 1B1.13(b)(3)(C).

The United States Sentencing Commission's Sentencing Guidelines list the type of extraordinary and compelling reasons that can satisfy the First Step Act's standard for early release. *See* U.S.S.G. § 1B1.13(b). A defendant can be granted early release upon demonstration of (1) the defendant's own terminal medical condition; (2) the defendant's old age; (3) family circumstances of the defendant; (4) abuse by a correctional officer while imprisoned; (5) "other reasons" of similar gravity to the above; or (6) an unusually long sentence. *Id.* § 1B1.13(b)(1)–(6). Effective November 1, 2023, the Sentencing Commission amended its Sentencing Guidelines to expand the list of circumstances that could be considered "extraordinary and compelling" circumstances meriting compassionate release under 18 U.S.C. § 3582(c)(1)(A). As part of the amended guidelines, the Sentencing Commission stated that "extraordinary and compelling" reasons" for a sentence reduction may exist due to "[t]he incapacitation of the defendant's parent when the defendant would be the only available caregiver for the parent." U.S.S.G. § 1B1.13(b)(3)(C). Defendant here seeks relief pursuant to this part of the "family circumstances" subsection. *See id.* § 1B1.13(b)(3).

Defendant has not sufficiently proven that either his mother or father is incapacitated. In this context, a person who is incapacitated is "completely disabled, meaning that the [individual] cannot carry on any self-care and is totally confined to a bed or chair" or "has . . . [a] severe cognitive deficit." BOP Program Statement § 5050.50 at 10 (defining "incapacitation" for an inmate's "spouse or registered partner"); *see also United States v. Tobolsky*, No. 21-303, 2024 WL 323476, at *3 (D.N.J. Jan. 29, 2024) (applying BOP Program Statement § 5050.50 to defendant's stated need to care for his father). To carry his burden, Defendant must provide "adequate information and documentation . . . including, but not limited to, a statement and verifiable medical documentation regarding the individual's incapacitation [and] a statement and letters of documentation that the inmate is the only family member capable of caring for the individual." *United States v. Walker*, No. 19-928, 2024 WL 580152, at *3 n.2 (D.N.J. Feb. 13, 2024) (internal quotation marks omitted).

As to Defendant's father—who Defendant asserts has severe diabetes that has led to his leg amputation—Defendant submitted an exhibit of eight pages that are mostly blank or otherwise unreadable. (ECF No. 9-1 at 1–8.) The first page includes two handwritten notations: "Father's Records" and "Steve leg amputation." (*Id.* at 1.) It is not clear who wrote these notes. The rest of the page is unreadable. The top of the next six pages legibly read "Jefferson Health" but the rest of the page appears blank. (*Id.* at 2–7.) The final page of the father's records clearly says "THORNTON, Steve," but the rest of the page, including some handwritten notes, is illegible. (*Id.* at 8.) Defendant has not provided any other evidence or affidavits regarding his father's health. This information regarding Defendant's father plainly fails to satisfy his burden under Section 1B1.13(b)(3).

As to Defendant's mother, Defendant provided legible medical records evidencing that she previously had colon cancer, that her kidney function was abnormal "20 years ago," and that she received a colonoscopy in 2021 and had a polyp removed. (*Id.* at 12–15.) Additionally, the most recent medical records submitted by Defendant are from nearly ten months before Defendant filed the subject application and only list Defendant's mother's prescribed medications and allergies. (ECF No. 9-1 at 10.) Medical records regarding her actual ailments are from October 2022. (*See id.* at 11.) These medical records do not substantiate that Defendant's mother is *presently* unable to "carry on any self-care" or is "totally confined to a bed or chair." *See* BOP Program Statement § 5050.50 at 10.

Even if both of Defendant's parents were incapacitated, Defendant has not shown that he is the "only available caregiver for [his] parent[s]." U.S.S.G. § 1B1.13(b)(3)(C). Although Defendant states in a conclusory manner that "there are no family members or friends available to provide the level of care" that his parents require (ECF No. 9 at 1), this is not the type of "strong evidence" the Court requires to grant Defendant's application. *See United States v. Striganivicz*, No. 95-271, 2023 WL 4868100, at *1 (E.D. Pa. July 31, 2023) (explaining that courts have "denied motions for compassionate release premised on sick or elderly parents in the absence of *strong evidence* the petitioner is the *sole* individual capable of caring for the parent." (first emphasis added, second emphasis in original) (internal quotation marks omitted)). On reply, Defendant argues that he is "unclear as to how [he] can show/provide the 'negative' [that there is no one else able to care for his parents] and it is up to whomever is investigating [his] claims to show otherwise." (ECF No. 11 at 1.) Defendant places the burden on the Government to "provide evidence to support that [other] individuals are willing and able to provide permanent and reliable care." (*Id.* (emphasis in original).) Defendant misunderstands the burden here; it is *his* burden, not

the Government's, to prove that he is the sole caregiver for his parents. *See Walker*, 2024 WL 580152, at *3 n.2.

Additionally, Defendant admits that he has siblings, stating that they are simply unable and/or unwilling to "step in and provide the necessary care needed." (ECF No. 11 at 1); *see United States v. Dunich-Kolb*, No. 14-150, 2022 WL 580919, at *8 (D.N.J. Feb. 14, 2022) ("One common thread, whether relief is granted or denied, is the requirement that the prisoner be the *only* person available to provide care to a seriously ill relative." (emphasis in original)). Despite Defendant's averments that no evidence could have possibly supported his request here, he could have—and should have—submitted a "statement and letters of documentation that [he] is the only family member capable of caring for the parent." *United States v. Donald*, No. 21-41, 2024 WL 4581209, at *4 (D. Del. Oct. 24, 2024) (internal quotation marks omitted) (citing BOP Program Statement § 5050.50). Without such evidence, Defendant has failed to establish any extraordinary or compelling reason for his relief.

### B. FACTORS UNDER 18 U.S.C. § 3553(a)

The Court now turns to the Section 3553(a) factors and, having weighed the necessary factors, finds that the applicable factors weigh decidedly against granting Defendant's application.[4] The Court need only consider the 3553(a) factors "to the extent that they are applicable." 18 U.S.C. § 3582(c)(1)(A). Here, the Court considers *inter alia*, (1) "the nature and circumstances of the offense and the history and characteristics of the defendant" and (2) the need for the sentence

---

[4] To be clear, having found that Defendant has not presented any extraordinary and compelling reasons for release, the Court is not required to discuss the Section 3553(a) factors. *United States v. Robinson*, 852 F. App'x 669, 701 (3d Cir. 2021) (affirming district court's denial of compassionate release because defendant "fail[ed] to cite any case law suggesting that the Court was required to discuss [the 3553(a)] factors independently if it did not find extraordinary and compelling reasons"). Nonetheless, the Court considers those factors here for completeness purposes.

imposed to reflect the seriousness of the offense, deter criminal conduct, and protect the public from future crimes of the defendant. *See* 18 U.S.C. § 3553(a)(1)–(2).

These factors weigh heavily against Defendant. Indeed, Defendant's criminal conduct—beginning with the unlawful purchase of a firearm via deceptive means—culminated in the killing of an innocent 14-year-old boy who was asleep in his bed and does not appear to have had any involvement whatsoever in the ongoing drug- and money-fueled feud between rival organizations. (*See* ECF No. 1-1.) Defendant's recklessness and penchant for revenge led to the gravest of consequences, and the Court finds the nature of the offense to be both tragic and most serious. What's more, this was not Defendant's first offense; his conviction as a felon in the unlawful possession of a firearm makes clear that he had already been convicted of a felony at least once before; indeed it appears he was convicted of multiple felony offenses for drug distribution, weapons, and hindering prior to the subject offense. (*See* PSR ¶¶ 92, 97, 99.) Defendant's juvenile record includes some eleven adjudication for multiple assaults, drugs, and thefts, among other offenses, culminating in four sentences to two years in custody as a juvenile. (*Id.* ¶¶ 66, 68, 70, 78, 80, 82, 84, 86.) After a five-year sentence for drug distribution and weapons, he was out of prison for only eight months before committing the subject murder of a seemingly innocent, sleeping child. (*Id.* ¶¶ 20 (released from prison on January 25, 2005), 23 (committed subject offense on August 28, 2005).) Any previous punishment did not sufficiently deter him.

In addition, Court is in receipt of Defendant's inmate discipline record. (ECF No. 10-1.) As Defendant himself acknowledges, he has "had his share of incidents." (ECF No. 11 at 3.) However, he attempts to explain away these incidents by asserting that "those incidents are few and far between and other than defending myself when targeted and threatened by other inmates, my incidents are non-violent." (*Id.*) Indeed, the Court notes that since 2009, Defendant has been

9

disciplined eleven times. Most recently, in June 2023, Defendant was disciplined for "disruptive conduct," and, before that, was disciplined for use of drugs and alcohol, assaulting a staff member, possessing gambling paraphernalia, being unsanitary, possessing unauthorized items, refusing to obey orders, and—on three occasions—fighting with another person. (*See generally* ECF No. 10-1.) While Defendant might well be on the path toward rehabilitation, present circumstances do not warrant his release.

The Court finds that the Section 3553(a) factors weigh decidedly against release. The sentence imposed reflects the seriousness of the offense—the murder of a seemingly-innocent fourteen-year-old boy. Additionally, given Defendant's extensive history of criminal conduct, which has not previously deterred him, the continued service of his sentence is warranted. Likewise, Defendant's continued incarceration will protect the public from his future crimes.

Therefore, because Defendant has not met his burden to demonstrate the existence of extraordinary and compelling circumstances for relief and the Section 3553(a) factors weigh against release, Defendant's Motion for Compassionate Release is **DENIED.**

Accordingly, **IT IS**, on this 3rd day of September, 2025,

**ORDERED** that Defendant's Motion for Compassionate Release (ECF No. 9) is **DENIED;** and it is further

**ORDERED** that the Clerk of Court is directed to **TERMINATE** the Motion pending at ECF No. 9; and it is further

**ORDERED** that the Clerk of Court is directed to mail a copy of this Memorandum Order to Defendant's address on record via regular U.S. mail.

_____
**ROBERT KIRSCH**
**UNITED STATES DISTRICT JUDGE**
